AUSA: Ariana L. Bloom

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BRIAN PERALTA CABRERA,<br><br>Defendant. | **26 MAG 1017**<br><br>**COMPLAINT**<br><br>Violations of<br>21 U.S.C. § 846.<br><br>COUNTY OF OFFENSE:<br>NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

KYLE HARRELL, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA"), and charges as follows:

## COUNT ONE
## (Conspiracy to Distribute Narcotics Resulting in Death)

1. From at least on or about February 27, 2026, through at least on or about March 18, 2026, in the Southern District of New York and elsewhere, BRIAN PERALTA CABRERA, the defendant, and others known and unknown, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate the controlled-substance laws of the United States.

2. It was a part and an object of the conspiracy that BRIAN PERALTA CABRERA, the defendant, and others known and unknown, would and did distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

3. The controlled substance involved in the offense was a quantity of mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 841(b)(1)(C).

4. The use of such controlled substances resulted in death to a 20-year-old woman ("Victim-1") and resulted in serious bodily injury to an 18-year-old woman ("Victim-2"), in New York, New York.

(Title 21, United States Code, Section 846.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5. I am a Special Agent with the DEA and have been personally involved in the investigation of this matter. The affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and

conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**The Overdoses**

6. Based on my participation in this investigation, my conversations with other law enforcement officers, my review of law enforcement documents and records, medical records, and interviews by members of law enforcement with medical professionals, and my review of body-worn camera video and surveillance video collected from a particular undergraduate college residence hall in New York, New York (the "Residence Hall"), I have learned, among other things, the following:

a. On or about March 18, 2025, at approximately 1:50 a.m., CC-1 entered through the front doors of the Residence Hall, was met by Victim-1 in the lobby, provided his identification card to security guards working at the Residence Hall, and was admitted into the Residence Hall as a guest of Victim-1. CC-1 and Victim-1 then entered the elevator in the Residence Hall.

b. At approximately 3:10 a.m.—that is, approximately 80 minutes later—CC-1 returned to the Residence Hall's first floor alone and approached security guards working in the lobby of the Residence Hall. CC-1 reported to security guards, in substance and in part, that he was a guest in the Residence Hall and had been with two women who had been drinking alcohol and who had since become unresponsive.

c. CC-1 then led security guards to a particular room on the sixth floor of the Residence Hall ("Room-1"), where Victim-1 was lying unresponsive in a bed and Victim-2 was lying unresponsive on the floor. Residence Hall security guards administered Narcan at least to Victim-1 and called 911.[1] Victim-1 and Victim-2 were later identified as university students and the occupants of Room-1.

d. When members of emergency medical services arrived at Room-1, Victim-1 was still lying unresponsive in a bed, and Victim-2 was still lying unresponsive on the floor. Victims-1 and -2 were examined by members of emergency medical services, who began attempting to provide lifesaving courses of treatment to Victims-1 and -2 in Room-1.

e. Victim-1 was then transported via ambulance to a particular hospital ("Hospital-1"), and Victim-2 was transported via ambulance to a second particular hospital ("Hospital-2").

f. Toxicology screenings were performed on urine samples taken from Victim-1 at Hospital-1 and Victim-2 at Hospital-2. Each of the toxicology reports for Victims-1 and -2 indicated the presence of fentanyl. The toxicology reports for Victims-1 or -2 indicated neither the presence of any other opioid, nor the presence of cocaine.

g. Victim-1 received continued emergency medical treatment at Hospital-1 but did not regain consciousness. Between on or about March 18, 2026 and on or about the evening of March 21, 2026 Victim-1 appeared to be in a comatose state, and medical professionals at Hospital-1

[1] Narcan, or naloxone, is an opioid antagonist used to counteract the deadly effects of drugs like fentanyl.

were unable to detect neural activity. Victim-1 did not regain consciousness and, on or about the evening of March 21, 2026, Victim-1 died at Hospital-1.

h. Victim-2 received continued emergency medical treatment at Hospital-2 and regained consciousness. Victim-2 received additional medical supervision and treatment at Hospital-2, and was later discharged.

7. Based on my participation in this investigation, including my participation in voluntary interviews of Victim-2 conducted on or about March 18, 2026 and March 21, 2026 (the "Victim-2 Interviews"), my conversations with other law enforcement officers, and my review of law enforcement documents and records, I know that during the Victim-2 Interviews, Victim-2 said, in substance and in part, that (i) CC-1 brought a small plastic bag containing white powder to Room-1 on or about March 18, 2026 and offered the contents of the bag to Victims-1 and -2, (ii) Victim-2 ingested the substance in the bag, and (iii) Victim-2 lost consciousness shortly after using the substance.

**Search of CC-1's Phone**

8. On or about the afternoon of March 18, 2026, CC-1 was arrested and law enforcement officers took custody of CC-1's cellphone (the "CC-1 Phone"). Based on my review of the contents of CC-1's Phone, my communications with other law enforcement officers, and my review of documents and other investigative materials, I have learned the following, among other things:

a. Between on or about February 20, 2026, and on or about March 7, 2026, the user of the CC-1 Phone (that is, CC-1) engaged in a conversation via text message with the user of a particular number ending in -3315 (the "Dealer") in which they discussed CC-1 purchasing drugs from the Dealer.

b. On or about February 27, 2026, the Dealer texted CC-1 saying, in substance and in part, that he found "pure shit" that was $55 per gram. Then, on or about March 1, 2026, the Dealer informed CC-1, in substance and in part, that he had just gotten drugs for CC-1 and sent the below photographs to CC-1.



c. On or about that same day, that is, March 1, 2026, CC-1 and the Dealer made plans to meet on the following Friday (that is, March 6, 2026) for the contemplated drug deal. During the conversation on or about March 1, 2026, CC-1 told the Dealer, that, "hopefully this shit is as strong as u say it [is] cuz these bitches will get addicted to it, ask me to bring more and I keep buying from u, u make ur money from me and I get to party with these bitches." Based on my training, experience, and involvement in this investigation and others, I believe that CC-1 and the Dealer were discussing CC-1's plans to further distribute the Dealer's drugs, including to the two Victims.

d. On or about March 6, 2026, CC-1 and the Dealer exchanged text messages about meeting in the vicinity of the 121st Street subway station, in South Richmond Hill, Queens, for the contemplated drug deal. From my review of those text messages, I believe that CC-1 and the Dealer met by the back exit of the 121st Street subway station between approximately 8:54 p.m. and approximately 9:40 p.m. that same day, March 6, 2026.

e. At approximately 10:46 p.m. on or about March 6, 2026—that is, approximately one or two hours after meeting with the Dealer—CC-1 sent the picture depicted at below left to a particular contact in the CC-1 Phone. Then, at approximately 11:35 p.m. on or about March 17, 2026—that is, approximately 2 hours before CC-1 arrived at the Residence Hall and approximately 3.5 hours before CC-1 alerted Residence Hall security guards that Victims-1 and -2 were unresponsive—the CC-1 Phone was used to create the picture depicted at below right. Based on my review of the photographs below and above, I believe that the bags in the two pictures above (which are photographs sent by the Dealer) are consistent in appearance with the bags in the two pictures below (which are photographs captured on the CC-1 Phone).




**Identification of BRIAN PERALTA CABRERA as the Dealer**

9. Based on my participation in this investigation, my conversations with other law enforcement officers, and my review of law enforcement reports and records, I know that on or about March 24, 2026, while conducting surveillance in or around Queens, New York, law enforcement encountered BRIAN PERALTA CABRERA, the defendant. While surveilling PERALTA, law enforcement dialed the number ending in -3315 that the Dealer had been using to communicate with CC-1, and observed that PERALTA answered the call.

10. Based on my participation in this investigation, my conversations with other law enforcement officers, and my review of law enforcement documents and records, including video captured at a precinct of the New York City Police Department (the "NYPD") where PERALTA gave a statement, I have learned, among other things, the following:

a. On or about the afternoon of March 24, 2026, BRIAN PERALTA CABRERA, the defendant, was arrested and taken to a local precinct of the NYPD, advised of his *Miranda* rights, which he waived, and subsequently agreed to speak with law enforcement officers.

b. During the interview that followed, PERALTA told law enforcement officers, in substance and in part, that (i) PERALTA recently sold CC-1 a white substance that PERALTA assumed was cocaine; (ii) PERALTA sent pictures of the substance, including pictures of the substance being weighed, to CC-1 before selling it to CC-1, and; (iii) the pictures of the substance PERALTA sent to CC-1 should still be on his phone.

c. PERALTA also signed a written consent form allowing law enforcement officers to search the cellphone that PERALTA had with him (the "Peralta Phone").

11. Based on my review of the Peralta Phone, and my communications with other law enforcement officers who have also reviewed the Peralta Phone, I know that the Peralta Phone contained the conversation with CC-1 described above, along with the pictures shown in Paragraph 8(b), *supra*.

* * *

12. Based on the foregoing, I respectfully submit that there is probable cause to believe that BRIAN PERALTA CABRERA, the defendant, provided CC-1 the fentanyl that caused the death of Victim-1 and serious bodily injury to Victim-2.

WHEREFORE, I respectfully request that BRIAN PERALTA CABRERA, the defendant, be imprisoned or bailed, as the case may be

KYLE HARRELL
Special Agent
Drug Enforcement Administration

Sworn to before me this 25th day of March, 2026.

THE HONORABLE JENNIFER E. WILLIS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK